**DAIRY FRESH CORPORATION, as Plan Administrator of the Dairy Fresh Employee Stock Ownership Plan and in its corporate capacity, Plaintiff,**

v.

**Victor POOLE, in his capacity as the Trustee of the Dairy Fresh Employee Stock Ownership Plan, and the Dairy Fresh Employee Stock Ownership Plan, Defendants,**

**Alexis M. Herman, Secretary of the United States Department of Labor, Plaintiff,**

v.

**Dairy Fresh Corporation, as Plan Administrator of the Dairy Fresh Employee Stock Ownership Plan and in its corporate capacity, Victor Poole, in his capacity as Trustee of the Dairy Fresh Employee Stock Ownership Plan, and the Dairy Fresh Employee Stock Ownership Plan, Defendants.**

**No. Civ.A. 96-0187-CB-C.**

United States District Court, S.D. Alabama, Northern Division.

Aug. 9, 2000.

**1346**

James H. Seale, III, Greensboro, AL, Matthew C. McDonald, Miller, Hamilton, Snider & Odom, Mobile, AL, Gary S. Tell, U.S. Dept. of Labor, Office of the Solicitor, Plan Benefits Security Division, Washington, D.C., for Dairy Fresh Corporation, plaintiff.

A. Clay Rankin, III, Douglas L. McCoy, Hand Arendall, L.L.C., Mobile, AL, for Lemuel Morrison, Beatrice Morrison, Lemuel, John L. Morrison, intervenors-plaintiffs.

Gary S. Tell, U.S. Dept. of Labor, Office of the Solicitor, Plan Benefits Security Division, Washington, D.C., Michael Schloss, Trial Attorney, U.S. Dept. of Labor, Office of the Solicitor, Plan Benefits Security Division, Washington, D.C., Timothy D. Hauser, U.S. Department of Labor, Plan Benefits Security Division, Washington, DC, for United States Department of Labor, intervenor-plaintiff.

Wade B. Perry, Jr., Johnstone, Adams, Bailey, Gordon & Harris, Mobile, AL, for Victor Poole, defendant.

Gary S. Tell, U.S. Dept. of Labor, Office of the Solicitor, Plan Benefits Security Division, Washington, D.C., for Alexis Herman, defendant.

### MEMORANDUM OPINION AND ORDER

BUTLER, Chief Judge.

This matter is before the Court on motions for summary judgment filed by Alexis Herman, Secretary of Labor and by Dairy Fresh Corporation. At the heart of this case is whether plaintiff Dairy Fresh Corporation ("Dairy Fresh") can bring an action which, if successful, would drastically reduce the holdings of the Employee Stock Ownership Plan (hereinafter "the ESOP" or "the Plan") created by the company. The Secretary of Labor has filed a complaint in intervention on behalf of the Plan's participants and beneficiaries opposing the company's action. The Plan's trustee, Victor Poole, the defendant in this action, has taken inconsistent positions on the proposed reformation of the Plan sought by Dairy Fresh. Initially Poole agreed with Dairy Fresh that the percentage of the company held by the ESOP should be reduced by almost half. After the complaint in intervention, Poole aligned himself with the Secretary, taking the position that Dairy Fresh cannot divest the ESOP of a substantial portion of its assets.

Not only does the Secretary oppose the claims asserted by Dairy Fresh in this action, she also seeks the company's removal as Plan Administrator, claiming that the company breached its fiduciary duty to the Plan by bringing this action in the first instance. Furthermore, the Secretary seeks the removal of Poole as Plan Trustee, alleging that Poole has breached his fiduciary duty by failing to defend vigorously the Plan's assets from Dairy Fresh's attempted reformation.

Upon extensive review of the undisputed evidence and careful consideration of all of the issues raised in the numerous pleadings and briefs filed by the parties, the Court finds: (1) that Dairy Fresh has no cause of action against Poole, (2) that by actively seeking to divest the Plan of its assets Dairy Fresh has breached its fiduciary duty to the Plan and its participants and beneficiaries and (3) that Poole's initial acquiescence to Dairy Fresh's position in this action and his failure to investigate the underlying claim amounts to a breach of fiduciary duty. The factual and legal bases for the Court's conclusions are set out more fully below.

### I. Findings of Fact

#### A. Background

In late 1988, Dairy Fresh Corporation established the Dairy Fresh Corporation

Employee Stock Ownership Plan as an employee benefit plan within the meaning of the Employee Retirement Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Prior to establishing the ESOP, Dairy Fresh enlisted the services of an attorney, Howard Neiswender of the law firm Tanner & Guin, to assist them. According to Willie E. Burt, who was president of Dairy Fresh at the time, the company relied completely on Neiswender to do whatever was necessary to create the ESOP. (Burt Oct. 8, 1997 Dep. at 15) The company had two equally important goals in creating the Plan. One was to provide a retirement plan for its employees. The other was to refinance the company's existing debt.[1] (Neiswender Dep. at 87–88)

Dairy Fresh, in its corporate capacity, established the ESOP on November 2, 1988, and named AmSouth Bank, N.A. as the trustee. The document governing the Plan ("Plan Document") vests the trustee with the power to control and manage plan assets: "The Trustee shall have the sole responsibility for management of the assets held under the Trust." Section 10.6(a) of the Plan Document, which deals with the diversion of the corpus or income of the trust, states as follows: "Except as provided below and otherwise specifically permitted by law, it shall be impossible for any part of the corpus or income maintained by any trust fund maintained by the Plan or any funds contributed thereto to be used for, or diverted to, purposes other than the exclusive benefit of the Participants, Retired Participants, or their Beneficiaries." Section 10.6(b) allows the return of excessive contributions paid by the employer.

Dairy Fresh became the Administrator of the Plan. As Plan Administrator, Dairy Fresh has "the primary responsibility ... to administer the Plan for the exclusive benefit of the Participants and their Bene-

ficiaries, subject to the specific terms of the Plan." (Plan Doc. § 2.6) The Administrator has the authority to determine all questions arising in connection with the administration, interpretation, and application of the Plan[,] ... [and] such determination[s] shall be conclusive and binding upon all persons." (*Id.*) The Administrator also has the power to establish procedures, correct any defect, supply any information or reconcile any inconsistency in such manner and to such extent as shall be deemed necessary or advisable to carry out the purpose of the Plan; provided, however, that any procedures, discretionary act, interpretation or construction ... shall comply with the terms of the Act and all regulations issued pursuant thereto." (*Id.*) Among the specific duties of the Administrator enumerated in the Plan Document are the duty "to compute, certify, and direct the Trustee with respect to the amount and the kind of benefits to which any Participant shall be entitled [under the Plan]." (*Id.* § 2.6(b)) Concomitantly, the Plan Document requires that the Trustee "[a]t the direction of the Administrator, to pay benefits required under the Plan to be paid to Participants, or in the event of their death, to their Beneficiaries[.]" (*Id.* § 8.1). Finally, the Administrator has authority "to interpret the provisions of the Plan and to make and publish such rules for regulation of the Plan as are consistent with [its] terms[.]" *Id.* § 2.6(b), (e).

**B.  The  ESOP  Transaction—1,247,002 Shares for $5.2 Million**

Members of the Dairy Fresh Board of Directors intended that the ESOP would borrow $5.2 million from SouthTrust Bank, N.A. to purchase newly issued shares of Dairy Fresh stock and that the shares purchased would have a value of $5.2 million. (Pretrial Order at ¶¶ 8, 10) This transaction was accomplished, in part, through a document issued by Dairy Fresh

---

1.  It appears that the idea for an ESOP initially came about because of the concerns of J. L. Morrison, principal shareholder of the closely held corporation, about the liquidity of his estate, the company's recent performance and about Morrison's personal liability for the company's debt. (Neiswender Depo. at 47–48, 53–54)

in its capacity as Plan Administrator, entitled "Direction to Trustee of Dairy Fresh Employees Stock Ownership Plan", which states:

Pursuant to the terms and provisions of the Dairy Fresh Employees Stock Ownership Plan ("the Plan"), Dairy Fresh Corporation, as Plan Administrator of the aforesaid Plan, does hereby direct AmSouth Bank, N.A., as Trustee of the Plan to enter into that certain Loan Agreement between the Plan, South-Trust Bank of Alabama, N.A., Dairy Fresh Corporation, and the Individual Guarantors, to purchase 1,247,002 shares of the voting common stock of Dairy Fresh Corporation from said corporation for a purchase price of $5,200,-000.00, *such purchase price having been determined in accordance with an independent appraisal as required by the appropriate regulations and the Plan.*

(Dairy Fresh Ex. 20; Secretary's Ex. 13) (emphasis added).

Neiswender obtained an independent appraisal of Dairy Fresh from Gene Dilmore of Realty Researchers, Inc., a stock valuation firm. On December 16, 1988, Dilmore concluded that the market value of Dairy Fresh's 148,756 outstanding shares was $5,820,431, or $39.13 per share. (Secretary's Ex. 7) Based on Dilmore's valuation report, Neiswender calculated the number of shares to be issued and the price per share, taking into consideration the issuance of new shares. Neiswender subtracted $5.2 million, the value of stock sold to the ESOP, from Dilmore's valuation figure, then divided the result by the number of shares outstanding to arrive at a price per share of $4.17. (Neiswender Dep. at 135–36) Neiswender then divided the total amount to be paid by the ESOP ($5.2 million) by the price per share ($4.17) to

determine that the ESOP would purchase 1,247,002 shares. (*Id.*)

Neiswender deliberately chose a conservative approach to arrive at the number of shares to be issued and the price per share. (*Id.* at 123–24) He felt that a more aggressive, or generous, valuation, would make the transaction susceptible to attacks from the Plan participants as well as the Department of Labor and the Internal Revenue Service. (*Id.*) The valuation formula Neiswender used was in line with a 1983 Department of Labor opinion Neiswender had seen regarding leveraged transactions which held that an ESOP should receive a dollar's worth of equity in the company for every dollar paid. (*Id.* at 124)

Closing on the ESOP transaction took place on December 30, 1988. Burt, as president of Dairy Fresh, signed the direction that instructed the trustee to purchase the stock on behalf of the ESOP. (Burt Aug. 22, 1997 Dep. at 117) Burt understood that the direction authorized the trustee to purchase 1,247,002 shares for $5.2 million dollars. (*Id.* at 138, 140–42, 145) In his deposition testimony, Burt agreed that neither the number of shares nor the purchase price was a typographical error. (*Id.* at 141–42) Burt did not know and did not inquire how Neiswender calculated the number of shares to be sold. (Burt Oct. 8, 2997 Dep. at 14–15) According to Richard Brady, the AmSouth trust officer who was responsible for handling the Dairy Fresh ESOP account, "Neiswender communicated the formula he used in calculating the number of shares to AmSouth on the day the stock certificate for the shares was delivered to AmSouth." (Dairy Fresh Ex. 1 Brady Aff. ¶ 5) [2]

---

**2.** Curiously, Brady's affidavit does not state the date on which the stock certificate was delivered to AmSouth. Thus, the Court is unable to draw the inference that Dairy Fresh would like, *i.e.,* that AmSouth was also unaware of Neiswender's method of calculating the purchase price prior to the closing. Records indicate that SouthTrust, the bank to which the stock was pledged as collateral, received the stock certificate on December 30, 1988. (Dairy Fresh Ex. 21) Logically, one would expect that the ESOP trustee, as pledgor, would have received the stock certificate at, or before, closing.

According to Nesweinder, Dairy Fresh had not been doing well financially for a couple of years prior to 1988 and could not afford to take on new debt.[3] (Neiswender Dep. at 88). Sales were down almost $10 million dollars and operating profits were down $2.4 million dollars from two years before. (*Id.*) The company's indebtedness totaled more than $5.2 million on loans made by J.L. Morrison, the company co-founder and principal shareholder, and by third party lenders. (*Id.* at 47–48, 53–54, 63–65, 86–88, 120–25) Morrison and other company officers and shareholders—Erwin Burt, Bob E. Tidmore and W.L. York—had personally guaranteed much of the company's indebtedness. The ESOP transaction extinguished these debts, including a $1.3 million dollar loan to AmSouth personally guaranteed by Morrison. In addition, Morrison, along with Burt, Tidmore, and York had loaned substantial amounts of money to Dairy Fresh. As a result, when the ESOP was created Morrison received more than $1.7 million, Tidmore received $454,690.69, Burt received $99,-097.64, and York received $84,165.70 in repayment of loans outstanding. (Secretary's Exs. 25 & 26).

In the months leading up to the ESOP transaction, Neiswender discussed with Morrison, Burt and other ·members of Dairy Fresh management the advantages and disadvantages of creating an ESOP, including the stock dilution experienced by other shareholders.[4] (Neiswender Dep. at 68) Shortly after the transaction, Neiswender sent Burt a letter discussing the dilutive effects of the transaction on the value of stock held by the pre-ESOP shareholders. (Secretary's Ex. 19) [5]

## C. Effects of the ESOP Transaction

The impact of the ESOP transaction upon the company and the pre-ESOP shareholders was significant. The ESOP's creation provided several advantages to

---

**3.** Dairy Fresh attempts to dispute the conclusion that it was experiencing financial difficulty *prior to 1988* by citing evidence that it had a positive cash position in the fiscal year that ended *February 1989.* (Dairy Fresh Corrected Narrative Disputing Facts Suggested by Secretary as Undisputed at 30–31) Obviously, the company's financial position during 1988–89 fiscal year establishes nothing with regard to its position during prior years. Thus, Dairy Fresh's evidence does not create a material dispute of fact.

**4.** Dairy Fresh also attempts, quite unsuccessfully, to dispute the Secretary's assertion that Neiswender explained the potential dilutive effects of the ESOP transaction. (Dairy Fresh Narrative Dispute at 18–21) Dairy Fresh points out that Neiswender admitted that he made no *written* disclosure. This does not contradict his testimony that he made these explanations verbally. Nor does the fact that Neiswender did not know, and therefore could not have explained, until he received the appraisal report the exact amount of dilution that would occur contradict his testimony that he discussed dilution with the company. Dairy Fresh cites Burt's deposition testimony to support its assertion that "according to the officers, the dilutive effect ... was not discussed prior to the closing of the purchase and sale transaction." Conspicuously absent from the supporting citation is any reference to a specific page number in Burt's

deposition. After reviewing all of the excerpts of Burt's deposition provided by Dairy Fresh, the Court has been unable to locate any testimony disputing Neiswender's assertion that he discussed the dilution issue with Dairy Fresh.

**5.** Interestingly, Dairy Fresh also disputes that this letter explained the dilutive effects of the ESOP on pre-ESOP shareholders because it did not discuss specifically the pre- and post-ESOP value per share. While the letter did not directly state that shares previously worth $39.13 were now worth $4.17, the import was clear. "[T]he establishment of the ESOP will make paying any future dividends of any significant amount to [pre-ESOP shareholders] extremely difficult *due to the dilution of their stock which resulted from the large number of shares that the company had to sell to the ESOP to cover the amount of the loan.*" (emphasis added) Neiswender went on to predict accurately the future course of events: "Because of the lack of dividends and benefits from the ESOP some of these non-employee shareholders may eventually become unhappy with the lack of return on their stock and attempt to bring some form of action against the Company." Neiswender advised that the company should begin negotiations with pre-ESOP shareholders to buy back their stock.

the company. The most obvious was retirement benefits for its employees. (Neiswender Dep. at 88) In addition, the company was able to refinance its existing debt through the ESOP and then repay that debt with pre-tax, rather than after-tax, dollars. (Socol Dep. at 251–52) A portion of the money from the ESOP (approximately $495,000) was placed into Dairy Fresh's regular checking account and used to pay other business expenses, thereby increasing the company's cash flow. (Secty.'s Ex. 25) Finally, by paying off the loan to Morrison with money from the ESOP, the company averted potential repayment problems that might arise upon Morrison's death. (York Aug. 1, 1997 Dep. at 45)

The ESOP transaction had both positive and negative effects on the pre-ESOP shareholders. The most obvious disadvantage was the dilution of the value of the stock held by pre-ESOP shareholders. For example, Morrison, the majority shareholder, became a minority shareholder. However, there were also definite benefits to the pre-ESOP shareholders, especially Morrison. As previously noted, the transaction provided Morrison, Burt, Tidmore, and York each with a significant amount of cash in repayment of their loans to the company and extinguished their potential liability on company debts. For Morrison, in particular, the ESOP's creation provided financial liquidity, eliminated personal liability on the corporation's debts and also eliminated some potential adverse tax consequences related to his personal loan to the corporation.

Maintenance of the ESOP is not without cost to the company. When a participant retires or separates from service, he has the right to sell his shares of Dairy Fresh stock to the company. (Plan Doc. § 7.11) This is referred to as the "put" option, and is mandated by law. Because Dairy Fresh is required to purchase these shares, it incurs costs in servicing the "put" option. If, as Dairy Fresh seeks, the number of shares are reduced, then the costs of servicing the "put" option will also decrease.

### D. Post–Transaction Events

#### 1. Litigation

The 1990's were a litigation-filled decade for Dairy Fresh and its management. J. L. Morrison died in 1992, and left his interest in Dairy Fresh to his wife, Beatrice Morrison, his daughter, Dr. Lemuel Morrison and his son, John L. Morrison, Jr. ("the Morrison family") (Secretary's Ex. 49) The Morrison family subsequently brought a number of lawsuits against Dairy Fresh, Burt, Tidmore and York. Among those were state and federal court actions filed in the Fall of 1994 related to the formation of the ESOP. The state court suit alleged that the creation of the ESOP was based on mistakes, including a misapprehension about the dilutive effects of the ESOP's stock purchase. The federal case was filed under ERISA and alleged that the potential dilutive impact of the transaction had been concealed.

In 1993 Dairy Fresh president W. E. Burt was convicted in this Court of price fixing under the Sherman Act. His sentence was increased for perjury arising from a deposition taken by the State of Florida. As a result of his conviction and the Morrison litigation, Burt was removed as president and chief executive officer of Dairy Fresh. He has agreed to be permanently barred from serving as a fiduciary with respect to the ESOP.

On May 14, 1996, the Circuit Court of Hale County removed York and Tidmore as executors of J. L. Morrison's estate for breach of fiduciary duty. The court found that York and Tidmore had used the estate's funds for their personal benefit.

#### 2. Poole Replaces AmSouth as Trustee

On October 14, 1994, Dairy Fresh appointed Victor Poole to replace AmSouth Bank as the ESOP's trustee. Poole agreed to the appointment on the condition that it would be temporary. (Poole Dep. at 24–27) Dairy Fresh also agreed to indemnify Poole for any claims with respect to his

actions as interim trustee and to pay him $200 per day if he should be required to testify in any legal proceeding related to his position as trustee. (Secty's Ex. 58, Successor Trustee Agreement; Secty's Ex. 59, Indemnity Agreement)

### 3. The Willamette Report

In early 1995 counsel for Dairy Fresh informed Poole that the company believed there had been a mistake in the formation of the ESOP and instructed Poole to retain his own counsel. (Poole Dep. at 57–58) Poole and Dairy Fresh then hired a consulting firm, Willamette Management Associates. Dairy Fresh has paid and continues to pay all of Willamette's fees associated with its opinion about the ESOP. (*Id.* at 73) On May 30, 1995, Willamette provided a report stating that the ESOP should have received 132,890 shares of Dairy Fresh stock in 1988 rather than 1,247,002. (Secty's Ex. 63)

The Willamette Report disagrees with the method used by Neiswender in calculating the number of shares to be sold. Put simply, Willamette's opinion is that Neiswender erred when he subtracted $5.2 million (the value of the stock sold to the ESOP) from the appraised value of the corporation because that amount of debt had already been taken into consideration in the appraisal.

### 4. Dairy Fresh Prefers the Willamette Approach

After receiving the Willamette report, Dairy Fresh, in its capacity as Plan Administrator, directed Poole to make annual distributions in accordance with the numbers contained in the report. Betty Gist, Dairy Fresh president and chief executive officer, wrote Poole regarding the Willamette Report. Gist explained that "Willamette has prepared a revised allocation report for the ESOP for each year through plan year end February 28, 1995. *The revised allocation report is based on the 132,890 shares calculated by Willamette, rather than the 1,247,002 shares that were initially issued to the ESOP.*" (Secretary's Ex. 64, Gist letter to Poole) (emphasis added) Gist further instructed Poole that "[t]he Administrator has determined that the pending distributions should be based on the revised number of shares not the original number of shares issued to the ESOP.... The Administrator proposes that the current stock distributions should be based on the revised number of shares calculated by Willamette.... All remaining account balances would be restated based on the revised number of shares." (*Id.*) In addition, Gist explained that the Company was "in the process of preparing proceedings to request approval from the United States District Court for the Southern District, ... for equitable relief under [ERISA] ... [which] would specifically include reformation of the ESOP so that it would hold the number of shares as calculated by Willamette." (*Id.*) Gist requested Poole's position regarding the reformation and the proposed distribution to participants. On February 27, 1996, Poole's attorney responded to Dairy Fresh's counsel, advising that Poole's position was that "the Court should be asked to give advance approval, both to the proposed reformation and to the proposed distribution." (Secretary's Ex. 65) On that same day, Dairy Fresh filed the instant action against Poole.

### 5. Global Settlement of Morrison Litigation

On January 14, 1997, Dairy Fresh and the Morrison family entered into a Global Settlement Agreement, agreeing to a settlement of all litigation between two sides. The Morrison family agreed to dismiss, with prejudice, the federal and state court actions relating to the formation of the ESOP. In exchange, Dairy Fresh obligated itself "to diligently and vigorously pursue [the instant] action seeking reformation of the Dairy Fresh ESOP (...)" Secretary's Ex. 52, Settlement Agreement at ¶ 13) Furthermore, Burt, Tidmore and York agreed to purchase all of the Morrison

family's outstanding common stock in Dairy Fresh if the company's action to reform the ESOP is successful. Consequently, if Dairy Fresh is successful in this action, Burt, Tidmore, York and their families, collectively, will own a majority interest in Dairy Fresh.

### 6. The Effects of the Proposed Reformation on ESOP Participants

If the ESOP were reformed in the manner Dairy Fresh proposes, the ESOP's ownership interest in the company would be reduced from 88% to 44%. The number of shares of stock allocated to each participant would be similarly reduced, *as would the dollar value of their holdings*. Reformation would not, as Dairy Fresh sometimes implies, simply reallocate the number of shares of stock while keeping the total dollar value the same. Rather, it would significantly decrease the total value of each ESOP participant's shares.

Participants who have received yearly statements setting forth the number and value of their shares would receive far less in expected benefits if the Plan were reformed. For example, Willie Gray, an employee of Dairy Fresh from 1986 to 1995, had received an account statement reflecting shares with a fair market value of $16,442.53. Under Dairy Fresh's proposed reformation, the fair market value of Gray's reduced number of shares would be $8,656.64. (Secretary's Ex. 47)

### E. Conduct of Dairy Fresh and Poole During this Litigation

At the time Dairy Fresh's Board of Directors authorized this lawsuit, the Board consisted of York, Tidmore, Gary T. Burt, James J. Overstreet, N.D. Brookshire, Lemuel Morrison and Betty Gist. Six of those seven directors were among the twenty largest holders of Dairy Fresh non-ESOP stock at the time this action was filed. If

Dairy Fresh is successful in obtaining reformation of the Plan, the percentage of the company owned by the non-ESOP shareholders will increase from 12% to 54%. Furthermore, Burt, Tidmore and York will effectively gain control of the company once they purchase the Morrison family stock, as they are obligated to do if reformation occurs.[6]

During this litigation, Dairy Fresh has withheld benefits owed to participants who have retired or separated from service. Dairy Fresh has informed those participants that there was a mistake in the creation of the ESOP which resulted in the issuance of too many shares of stock. Dairy Fresh has expended significant sums of money on this litigation which, if successful, will greatly benefit the non-ESOP shareholders and Board members who voted to pursue this litigation. While those individuals who would benefit from the reformation of the ESOP have expended no money on this action, the ESOP has indirectly, as majority shareholder of the corporation, been forced to bear much of the cost of this litigation.

When he filed his initial answer in this litigation, Poole agreed with Dairy Fresh that there had been a mistake in the number of shares issued and joined with Dairy Fresh in asking the Court to reform the ESOP. Prior to taking this position, Poole did not review the documents that established the ESOP, did not question the individuals who signed the ESOP agreements, did not interview the attorneys who oversaw the ESOP transaction and did not review the 1988 valuation report. (Poole Dep. at 42–45, 62) Poole relied solely on the Willamette Report, his own calculations and the advice of his attorney. (*Id.* at 65–71; Poole's Ans. to Interrog. at 4)

Prior to the intervention of the Secretary of Labor, Poole stipulated to all of the facts alleged by Dairy Fresh, including the

---

6. Collectively, the shares owned by Burt, Tidmore and York, individually, will amount to approximately 45% of the company if the reformation occurs. However, the total number of shares owned by Burt, Tidmore, York and their family members will amount to approximately 54%. (Gist Dep. at 248–49; Dairy Fresh Ex. 58, Payne Aff.)

fact that there had been an error in the calculating the number of share sold to the ESOP. Poole initially opposed the intervention of the Secretary of Labor in this action. However, after the Secretary was permitted to intervene, Poole changed his position. Poole now agrees that the proposed reformation would harm Plan participants and beneficiaries and has filed pleadings raising affirmative defenses and counterclaims. Even after changing his position, Poole has not actively participated in the discovery process during the course of this litigation, except to attend certain depositions.

### Conclusions of Law

#### A. Issues Presented

The numerous issues presented by the parties' motions for summary judgment can be summarized as follows. First, the Court must determine whether Dairy Fresh, as Administrator, can succeed on any of its causes of action to reform the Plan. Next, the Court must consider whether Dairy Fresh has, by bringing this lawsuit, breached its fiduciary duty as Administrator of the Plan. Finally, the Court must also decide whether Poole has, by his conduct during the course of this litigation, breached his fiduciary duty as Trustee. Before addressing each of these issues, it is helpful to review the standards to which the Court must adhere when deciding a motion for summary judgment.

#### B. Summary Judgment Analysis

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). Once the moving party has satisfied his responsibility, the burden shifts to the nonmoving

party to show the existence of a genuine issue of material fact. *Id.*

"If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *U.S. v. Four Parcels of Real Property in Greene and Tuscaloosa Counties, Ala.,* 941 F.2d 1428, at 1438 (11th Cir.1991) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must not weigh the evidence or make credibility determinations and must draw all inferences in favor of the nonmoving party." *Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994, 999 (11th Cir.1992), *cert. denied,* 507 U.S. 911, 113 S.Ct. 1259, 122 L.Ed.2d 657 (1993).

Factual disputes raised by the nonmoving party must be both *material and genuine.* "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). " 'Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record.' " *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir.1996) (quoting *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 918 (11th Cir.1993)).

#### C. Dairy Fresh Seeks Reformation of the Plan Through its Claims Against Poole

It is, at times, difficult to determine the precise legal theories under which Dairy Fresh proceeds. What is clear is that, whatever the legal theory, Dairy Fresh

seeks an end result that would reform the Plan retroactively in accordance with the Willamette Report's valuation. The amended complaint purports to be a declaratory judgment action for breach of fiduciary duty based upon ERISA, federal common law and state law. Dairy Fresh's motion for summary judgment argues only the merits of its ERISA breach of fiduciary duty claim. It does not address its claim for reformation under federal common law at all, and its discussion of the state reformation theory relates only to reformation as an equitable remedy for its breach of fiduciary duty claim.[7] For reasons discussed below, Dairy Fresh has failed to prove its breach of fiduciary duty claim. Moreover, Dairy Fresh is not entitled to reformation of the Plan under any theory—ERISA, federal common law or state law—because the facts do not support its claim of mutual mistake.

### 1. Dairy Fresh's Breach of Fiduciary Duty Claim

■ Dairy Fresh insists that it can achieve reformation of the Plan through its claim against Poole for breach of fiduciary duty.[8] The circularity of Dairy Fresh's breach of fiduciary duty argument is enough make a logician's head spin. Ac-

cording to Dairy Fresh, Poole breached his fiduciary duty as Plan Trustee when he "refused to make distributions as directed by the Administrator [in accordance with the revised allocation schedules]." (Dairy Fresh Sum. Jdgt. Brf. at 25)[9] The fallacy in this argument is that Dairy Fresh never had the authority to direct Poole to use the revised allocation schedule (which is simply the reformation Dairy Fresh seeks in this action) in the first place.[10] That fact is evident from the equitable relief that Dairy Fresh has requested. If Poole had breached his fiduciary duty by refusing to follow the revised allocation schedule, then the logical remedy would be injunctive relief against Poole requiring him to follow the revised allocation schedule. Instead, Dairy Fresh requests an equitable remedy that would completely reform the Plan in conformity the Willamette Report, which is the basis for the revised allocation schedule. Thus, Dairy Fresh implicitly recognizes that it did not have the authority to direct Poole to follow the revised schedule in the first place. In sum, Dairy Fresh's actions appear to have been calculated to create a breach of fiduciary duty action that would enable it to accomplish exactly what neither it nor Poole could not do in the first place—reform the Plan.

7. In any event, state law claims are preempted by ERISA, and federal common law would not apply. *See Boggs v. Boggs*, 520 U.S. 833, 843, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997) (preemption applies where state law stands as an obstacle to purpose and objectives of ERISA); *Dime Coal Co. v. Combs*, 796 F.2d 394, 398–400 (11th Cir.1986) (employer cannot bring claim under ERISA or federal common law for return of mistaken contribution).

8. The breach of fiduciary duty claim arises under 29 U.S.C. §§ 1132(a)(2) and 1109(a).

9. In an example of Dairy Fresh's often contradictory argument, the company, in a separate brief discussing whether Dairy Fresh itself has breached its fiduciary duty as Administrator by bringing this action in the first place, contends that it only suggested, but never directed, that Poole follow the revised allocation schedule. "Dairy Fresh, as Administrator, has not 'instruct[ed] Poole. to reduce stock distributions to participants based upon its claimed authority as a plan administrator and

fiduciary. Rather, Dairy Fresh notified Poole that it had been advised that an error had been committed at the time the ESOP initially acquired its shares ... [and] *propose[d]* that the current stock distributions should be based on the revised number of shares.' " (Dairy Fresh Brf. in Opp. to Sum.Jdgt. at 40) (emphasis added) If Dairy Fresh, as Administrator, never gave Poole a direction to follow, one is left to wonder why Dairy Fresh has made Poole's failure to carry out its direction to follow the revised allocation schedule the cornerstone of this action. In only stands to reason that Poole could not have breached his fiduciary duty for failing to follow the Administrator's direction when no direction was ever given.

10. The revised allocation schedule actually revalues the corporation as of 1988 and redistributes the number and value of shares in accordance with the Willamette Report.

Dairy Fresh asserts that Poole has violated certain fiduciary duties defined in ERISA. Specifically, the company points out that a fiduciary is obligated to discharge his duties solely in the interest of the participants and beneficiaries. 29 U.S.C. § 1104(a). Second, Dairy Fresh argues that Section 403(a) of ERISA obligates Poole to follow the company's directions. That section provides:

All assets of an Employee Benefit Plan shall be held in trust by one or more trustees. The trustee or trustees shall have exclusive authority and discretion to manage and control the assets of the Plan *except to the extent that the Plan expressly provides that the trustee or trustees are subject to the direction of a named fiduciary who is not a trustee, in which case the trustee shall be subject to proper directions of such fiduciary which are made in accordance with the terms of the Plan and which are not contrary to this Act.*

29 U.S.C. § 1103(a) (emphasis added). Although the Plan does give Dairy Fresh, as Plan Administrator, certain authority over the trustee, it is not that authority that Dairy Fresh has sought to exercise. Rather, Dairy Fresh has given Poole directives which are not in accordance with the terms of the Plan and which are contrary to the Act.

### a. The Plan Does Not Permit Dairy Fresh to Create the "Revised Allocation Schedule"

Dairy Fresh offers an interpretation of the Plan which it contends gives it the authority to order Poole to make distributions according to its "revised allocation schedule" and argues that its interpretation is determinative. Dairy Fresh contends that Section 2.6(b) of the Plan, which charges the Administrator with the duty "to compute, certify, and direct the Trustee with respect to the amount and the kind of benefits to which any Participant shall

be entitled[,]" confers upon it the power to require the Trustee to follow the revised allocation schedule. In addition, Dairy Fresh points out that Section 2.6 commits questions regarding the administration, interpretation and application of the Plan to the Administrator's discretion whose decisions on such matters are conclusive and binding. In essence, Dairy Fresh argues that it may interpret the Plan however it chooses and its interpretation must be followed. That is not the way ERISA works.

■ The interpretation of an administrator who labors under a conflict of interest is not entitled to deference, no matter how much discretion the plan document confers. *Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1566 (11th Cir.1990); *see also Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Alabama,* 41 F.3d 1476, 1481 (11th Cir.1995). If the evidence "demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefit determinations, the burden shifts to the fiduciary to prove that its interpretation ... was not tainted by self-interest." *Id.*

The Secretary has provided more than ample evidence that Dairy Fresh labors under a substantial conflict of interest. Dairy Fresh stands to benefit financially if its interpretation is given deference because, as the company itself points out, the costs of servicing the "put option" will be greatly diminished, thereby increasing its profits proportionately.[11] Moreover, Dairy Fresh is governed by a Board of Directors, several of whom stand to benefit financially if the Plan is reformed in accordance with the company's interpretation because the value of shares held by those members who were pre-ESOP shareholders will be greatly increased.

Since Dairy Fresh has a conflict of interest, it bears the burden of demonstrating

11. Contradicting itself, Dairy Fresh contends that it really does not benefit from the decreased cost of servicing the "put" while at the same time pointing out the company would potentially save $4.3 million dollars if its interpretation of the Plan prevails.

that its interpretation "benefits all of the Plan's participants and beneficiaries." *Brown*, 898 F.2d at 1567. The burden is virtually insurmountable in this case, given the breadth of Dairy Fresh's plan interpretation, but it is one Dairy Fresh nonetheless attempts to meet. Dairy Fresh argues that all Plan participants will benefit if its interpretation is controlling because the projected cost of servicing the "put" option, that is, purchasing back shares of participants and beneficiaries who have the option to sell them, *"will adversely impact the Plan participants who remain in the Plan."* (Dairy Fresh Reply Brf. at 12) (emphasis added) This argument misses the mark for several reasons. First, the "put" option is a statutorily mandated requirement that gives value to shares held by participants in a closely-held corporation because it ensures that the participants can sell their shares. Second, not all participants will benefit by Dairy Fresh's interpretation because those who sell their shares will not be adversely impacted. Finally, Dairy Fresh's argument does not take into account the fact that the number and value of *all* participants' shares will be greatly diminished if its interpretation prevails because the value of their shares will be reduced by half.

Furthermore, Dairy Fresh's interpretation of the Plan is broader than the facts of this case. Dairy Fresh cannot prove that any participant or beneficiary, much less all, would benefit from an interpretation that essentially grants the administrator the authority to reform the ESOP at will. Dairy Fresh is attempting to redefine the structure of the Plan using its powers to interpret the Plan and to determine the distribution of benefits. Such unfettered power in the hands of an administrator leaves participants and beneficiaries subject to precisely the type of action that Dairy Fresh has attempted in this case, *i.e.,* a unilateral reduction of benefits which simultaneously improves the financial position of the administrator/employer and its non-ESOP shareholders.

### b. Dairy Fresh's Direction to Poole is Contrary to both the Plan and ERISA

Poole is precluded by ERISA and the Plan document from taking any action that would divest the Plan of its assets. Section 403(c) of ERISA, which sets forth the duties of trustees, provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103. The language contained in Plan Document is similar, but even stronger:

> Except as provided below and otherwise specifically permitted by law, it shall be impossible by operation of the Plan or of the Trust, by termination of either, by power of revocation or amendment, by the happening of any contingency, by collateral arrangement or by any other means, for any part of the corpus or income of any trust fund maintained pursuant to the Plan or any funds contributed thereto to be used for, or diverted to, purposes other than the exclusive benefit of Participants, Retired Participants, or their Beneficiaries.

(Secretary's Ex. 2, Plan Doc. § 10.6)

█ Despite the uncontradicted evidence that the "revised allocation schedule" would reduce by nearly half the value of shares owned by the Plan and, at the same time, increase the value of shares owned by the pre-ESOP shareholders, Dairy Fresh tenaciously argues that no Plan assets would be affected by its attempted reformation. According to Dairy Fresh, the Plan never actually had what it terms "the erroneously issued shares" to begin with because those shares were issued by mistake. The Plan cannot be divested of something it never had, or so the argument goes. Dairy Fresh does not, however, explain why a mistake in the conveyance of shares to the ESOP would

mean that the Plan never actually had the disputed shares. Alabama law certainly does not support this premise. A contract based upon a mutual mistake is voidable rather than void. *See Finley v. Liberty Mut. Ins. Co.*, 456 So.2d 1065, 1067 (Ala. 1984). A voidable agreement results in a contract, while a void agreement is a nullity. *Ex Parte Banks*, 185 Ala. 275, 64 So. 74 (1913). Thus, even if there was a mistake, the transaction was merely voidable, which means that the disputed shares belong to the ESOP. Whether issued intentionally or by mistake, those shares, representing an 88% ownership interest in the company, had been assets of the Plan for approximately seven years when Dairy Fresh decided that the shares were mistakenly issued. Directing the Trustee to follow an allocation schedule that takes away those shares away would, without doubt, divest the Plan of its assets in contravention of both ERISA and the Plan Document.

### 2. No Reformation for Mutual Mistake

There can be no reformation for mutual mistake in this case for two reasons. First, no legal theory remains to support it. Dairy Fresh has alternatively pled that it is entitled to reformation as an equitable remedy for Poole's alleged breach of fiduciary duty or as a separate theory of recovery under federal common law or state law. Dairy Fresh appears to have abandoned its federal common law and state law theories, as none of its briefs address the Secretary's argument that federal common law does not apply and that state law is preempted by ERISA. Furthermore, as the preceding discussion makes clear, Dairy Fresh has failed to prove its ERISA claim for breach of fiduciary duty claim.[12]

■ Second, there was no mutual mistake in the creation of the ESOP. Alabama

law permits reformation of a written contract based on mutual mistake under the following circumstances:

> When through fraud, a mutual mistake of the parties or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised by a court on the application of the party aggrieved so as to express that intention, so far as it can be done without prejudice to the rights acquired by third persons in good faith and for value.

Ala.Code § 8–1–2 (1975). For numerous reasons, the evidence does not support a claim of mutual mistake. Before discussing why there was no mistake, it is necessary to understand the narrow focus of Dairy Fresh's mutual mistake argument.

The alleged mistake arises from a direction issued by Dairy Fresh, as Plan Administrator, to AmSouth, as Plan Trustee, instructing the Trustee to borrow $5.2 million dollars from SouthTrust and to use that $5.2 million to purchase 1,247,000 shares of Dairy Fresh stock, *"such purchase price having been determined in accordance with an independent appraisal as required by the appropriate regulations and the Plan."* The italicized language is the key to Dairy Fresh's contention that there was a mistake. According to Dairy Fresh, the mistake was that the purchase price of the shares was not "in accordance with" the independent appraisal because the independent appraisal valued the company's pre-ESOP stock at $39.13 per share.

#### a. The Alleged Mistake Was Not Contained Within the Contract that Dairy Fresh Seeks to Reform

The contract Dairy Fresh seeks to reform is the agreement between itself and

---

12. As noted earlier, Dairy Fresh's legal theories are somewhat amorphous. Any attempt by Dairy Fresh to base its state or federal common law reformation claim on § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3) is unavail-

ing, as that section only provides relief for violations of ERISA. *Moore v. American Federation of Television and Radio Artists*, 216 F.3d 1236 (11th Cir.2000).

the ESOP whereby the ESOP purchased 1,247,000 shares of stock from Dairy Fresh. The "mistake" Dairy Fresh points out is contained within its direction to AmSouth Bank, as Trustee for the ESOP, to purchase 1,247,000 shares for $5.2 million dollars. This direction is not an agreement. That Dairy Fresh now claims to be mistaken about the direction it gave is not grounds for reforming a separate agreement.

### b. There is no Evidence that the Trustee was Mistaken

Even if the Administrator's allegedly mistaken direction can be imputed to the remainder of the transaction, Dairy Fresh has failed to present evidence that the mistake was mutual. Dairy Fresh contends that both it and AmSouth mistakenly believed that the independent appraisal had determined 1,247,000 shares was the appropriate number of shares for the ESOP's $5.2 million investment. Dairy Fresh's argument focuses primarily on its own lack of understanding about Neiswender's valuation of the company. Dairy Fresh refers to the affidavit of Richard Brady, the AmSouth trust officer who handled the ESOP transaction, as evidence that the Trustee was also mistaken. However, Brady's affidavit does not support this proposition. Noticeably absent is any assertion by Brady that he believed that AmSouth was misled or mistaken about the number or valuation of shares to be purchased. Brady states only that AmSouth relied on Neiswender's calculations that the stock purchased had a value of $5.2 million. Brady's affidavit reveals little about what AmSouth did or did not know about the valuation of the stock [13] and does not provide enough information to support the conclusion that the alleged mistake was a mutual one.

### c. The Valuation was in Accordance with the Independent Appraisal

The mistake, according to Dairy Fresh, was Neiswender's failure to take the appraisal's pre-transaction value per share ($39.13) and divide that amount into $5.2 million to determine the number of shares to issue. Dairy Fresh reads the phrase "determined in accordance with" to mean that Neiswender was not permitted to take any other factors into account to determine the price per share and was required to use the price per share determined by the independent appraiser. Such an interpretation is too restrictive. The direction does not say that the price per share was "determined by" an independent appraisal, only that it was "in accordance with an independent appraisal." The "in accordance with" language encompasses what Neiswender did, that is, used the appraised price as a starting point to determine the value per share taking into consideration the issuance of new stock.

Dairy Fresh expends much energy attempting to prove that Neiswender should have used a different, less conservative method of valuation. In so doing, Dairy Fresh simply proves that—right or wrong—Neiswender used a valuation formula that is favored by some and disfavored by others. The issue in this case is not whether Neiswender's valuation was the preferred method but whether it was "in accordance with the independent appraisal". Since the starting point for Neiswender's formula was based on the independent appraisal, it can be considered "in accordance with" it. Consequently, Dairy Fresh operated under no mistake of fact when it relied on Neiswender's valuation.

### d. Reformation Would Prejudice Innocent Third Parties

The ESOP was created, in large part, to provide retirement benefits for Dairy

---

**13.** Brady admits that Neiswender communicated his valuation formula on the same day the Dairy Fresh stock certificates were delivered to AmSouth. Since the record does not reveal when the stock certificates were delivered, this information is virtually meaningless. If Brady had Neiswender's valuation formula before the transaction occurred, then the Trustee certainly operated under no mistake.

Fresh employees. The reformation requested by Dairy Fresh would decrease both the ESOP's ownership interest in the company and the fair market value of its stock by half. ESOP participants, therefore, would see the value of their retirement benefits cut in half.

Dairy Fresh closes its eyes to this evidence, suggesting that the employees never had these benefits in the first place. The company doggedly clings to the argument that the erroneously issued shares never existed and, therefore, never belonged to the ESOP. According to Dairy Fresh, these shares that never existed can simply be "canceled" so that no assets are diverted from the ESOP. These syllogisms appear frequently in Dairy Fresh's briefs, recited almost as mantras, with no supporting authority. Shares issued in error exist, otherwise they would not need to be canceled, and canceling shares makes their existence no less valid. Reducing the value of the ESOP's holdings, no matter how it is done, will cause prejudice to its participants and beneficiaries. No amount of legal gymnastics can change that fact.

### D. Secretary's Breach of Fiduciary Duty Claim Against Dairy Fresh

The Secretary argues that Dairy Fresh's actions in its capacity as Plan Administrator have violated certain fiduciary duties set forth in ERISA, including the duties of prudence and loyalty and the prohibition against self-dealing.[14] The Court finds that, by attempting to reform the Plan in a manner that would benefit the company while taking benefits away from the Plan and its participants and beneficiaries, Dairy Fresh has violated each of the foregoing duties.

### 1. Dairy Fresh Has Violated its Duty of Loyalty

Fiduciaries have the duty to act "with complete and undivided loyalty to the ben-

eficiaries" *Donovan v. Walton,* 609 F.Supp. 1221, 1228 (S.D.Fla.1985), *aff'd,* 794 F.2d 586 (11th Cir.1986). Section 404(a)(1)(A) requires that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries [ ] and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

■ Dairy Fresh has, by its conduct, demonstrated numerous acts of disloyalty to the Plan. First, it adamantly insists that there was a mistake in the formation of the Plan that resulted in the plan being overfunded, a position squarely in opposition to the best interests of the Plan and its participants. Moreover, Dairy Fresh has not simply espoused its position, it has actively sought to use the "mistake" to divest the Plan of assets. Dairy Fresh, as Administrator, has directed Poole to follow revised allocation schedules that would reduce the benefits of each plan participant. Dairy Fresh, as Administrator, has brought this action against Poole, seeking to have the Plan reformed in such a manner as to reduce the Plan's assets by one-half.

### 2. Dairy Fresh Has Engaged in Self-Dealing

Not only has Dairy Fresh, as Administrator, engaged in conduct disloyal to the Plan, its actions have amounted to self-dealing because, if successful, those actions would serve to benefit both Dairy Fresh, as a company, and its board members, individually. Section 406 prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account" and from "act[ing] in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficia-

---

**14.** In its capacity as Plan Administrator Dairy Fresh is a fiduciary within the meaning of

ERISA. *See* 29 U.S.C. § 1002(21)(A).

ries." 29 U.S.C. § 1106(b)(1), (b)(2). The protections against self-dealing fiduciaries provided by Section 406(b) are "broadly construed" and "liability [will] be imposed even where there is 'no taint of scandal, no hint of self-dealing, no trace of bad faith.'" *Lowen v. Tower Asset Mgmt., Inc.,* 829 F.2d 1209, 1213 (2d Cir.1987).

Dairy Fresh has acknowledged that its success in reforming the plan would lead to decreased expenses for the company because reformation would drastically reduce the cost of servicing the "put" option. Furthermore, Dairy Fresh board members, who authorized and control this litigation, would be the primary beneficiaries of the reduction in shares held by the ESOP. In particular, Burt, Tidmore, and York would gain effective control over Dairy Fresh.

### 3. Dairy Fresh Has Violated its Duty to Act Prudently

■ ERISA imposes a prudent man standard upon fiduciaries; that is, they must discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Fiduciaries have an obligation to preserve and maintain trust assets and to ensure that a plan receives all funds to which it is entitled. *Central States Pension Fund v. Central Transport,* 472 U.S. 559, 571–72, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985).

■ Dairy Fresh has not acted prudently in this case. To the contrary, Dairy Fresh has fought vigorously to reduce the Plan's holdings by, *inter alia,* filing this action seeking to reform the Plan and thereby reduce its holdings. Dairy Fresh argues that filing this lawsuit was actually a prudent action for two reasons. First, Dairy Fresh argues that future participants are harmed to the extent current participants get inflated benefits; therefore, Dairy Fresh claims it was obligated to bring this action to protect future participants.[15] Thus, Dairy Fresh uses the *possibility* of future challenges to the Plan to justify its attempt to take away benefits from current participants. Such speculative harm to future participants hardly compels an administrator to take a position in opposition to the interests of current participants. Second, Dairy Fresh contends that this action actually was brought to protect the Plan and its participants because that the cost of servicing the "put" option associated with the Plan decreases the value of the company and, therefore, decreases the value of the ESOP's holdings. Although increasing the value of the company, and the value of the ESOP's holdings, by decreasing costs makes sense in theory, it is not prudent for the Plan to advocate a position that would do so by taking away one-half of the Plan's holdings, reduce the Plan from majority to minority owner, and decrease participant's benefits by fifty percent.

### E. Poole Has Violated ERISA's Duties of Loyalty and Prudence

■ Although Poole now has aligned himself with the position of the Secretary, his early conduct in this action amounts to a breach of fiduciary duty. Poole has violated the duties of loyal and prudence [16] by failing vigorously to defend the Plan against Dairy Fresh's attempted reformation. Poole argues that he has satisfied his fiduciary obligations by refusing to acquiesce in the reformation and reallocation proposed by Dairy Fresh absent a court order. Nonetheless, Poole initially raised no defenses to Dairy Fresh's action and, until the Secretary's intervention, acquiesced in the proposed reformation. Ini-

**15.** Dairy Fresh apparently did not consider that the Plan might successfully defend against any such future action.

**16.** See discussion regarding standards of prudence and loyalty, *supra,* pp. 1358–60.

tially, Poole opposed the Secretary's intervention on behalf of the Plan and its beneficiaries. Furthermore, Poole made little, if any, inquiry into the basis for the proposed reformation. He never questioned individuals involved in the creation of the ESOP, never interviewed the attorney who performed the calculations, and never reviewed the 1988 valuation report or talked to the appraiser.

### F. Conclusion

In summary, the Court finds that Victor Poole did not breach his fiduciary duty by refusing to obey Dairy Fresh's directive to follow a revised allocation schedule. However, Dairy Fresh, as Administrator, violated its fiduciary duty to the Dairy Fresh ESOP by issuing such directive and by bringing maintaining this action. Similarly Poole, as Trustee, violated his fiduciary duty to the Dairy Fresh ESOP by initially failing to defend against and by failing to investigate the claims of Dairy Fresh against the ESOP. Accordingly, the motion for summary judgment filed by the Secretary is **GRANTED.** The motion for summary judgment filed by Dairy Fresh Corporation is **DENIED.**

### G. Remedies

The resolution of the foregoing issues in favor of the Secretary requires that the Court fashion relief. The Secretary seeks the removal of both Dairy Fresh and Poole as fiduciaries and seeks to have both permanently enjoined from serving in such capacity to any employee benefit plans. ERISA permits injunctive relief, including the removal of a fiduciary, as a remedy for a violation of its provisions. 29 U.S.C. § 1109(a). Moreover, violation of one of ERISA's statutory obligations or even "honest but imprudent" conduct is sufficient grounds for removing a fiduciary. *Beck v. Levering,* 947 F.2d 639, 641 (2d Cir.1991) (removal for violation of statutory obligation); *Brock v. Robbins,* 830 F.2d 640, 647–48 (7th Cir.1987) (removal for honest but imprudent conduct).

The Court need not conduct a hearing prior to removal if its decision arises from the granting for summary judgment. *Beck,* at 642. As part of the equitable relief associated with removal, the Court may appoint a substitute fiduciary. *Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.1984).

Accordingly, it is hereby **ORDERED** that Dairy Fresh Corporation be and hereby is removed as Administrator of the Dairy Fresh Employee Stock Ownership Plan and that Victor Poole be and hereby is removed as Trustee of the Dairy Fresh Stock Ownership Plan. Dairy Fresh Corporation and Victor Poole are hereby immediately and permanently **ENJOINED** from acting as fiduciaries on behalf of the Dairy Fresh Employee Stock Ownership Plan. As soon as practicable the Secretary of Labor shall submit the names of independent fiduciaries proposed to serve as Administrator and Trustee of the Dairy Fresh Employee Stock Ownership Plan.